St. Louis-San Francisco Railway Company *v.* Pollard.

4-6424                                        154 S. W. 2d 9

Opinion delivered July 14, 1941.

*E. G. Nahler, E. L. Westbrooke* and *E. L. Westbrooke, Jr.,* for appellant.

*Arthur Sneed* and *Z. B. Harrison,* for appellee.

HOLT, J. Appellees (plaintiffs below) shipped to Civil Works Administration, a government project, 364 cars of gravel from Piggott, Arkansas, to stations in northeast Arkansas. All of these cars moved in interstate commerce. Appellees sued appellants to recover certain alleged overcharges in freight rates in the amount of $873.75. They alleged in their complaint:

"That during the years 1933 and 1934 plaintiffs shipped 364 cars of gravel from Piggott, Arkansas, over

the lines of the St. Louis-San Francisco Railway Company consigned to the Civil Works Administration at various points in Arkansas; that at the direction of the defendants and with the agreement and understanding that defendants were to charge freight only for the actual weight thereon, said cars were loaded with less than the minimum weight provided therefor; that contrary to their said agreement, defendants collected from the Civil Works Administration freight calculated on the minimum weight capacity of said cars and the Civil Works Administration in turn deducted said sum from the purchase price of said gravel.''

Appellants filed an answer of general denial.

Upon a jury trial there was a verdict for appellees in the amount of $843.75. This appeal followed.

Appellants contend here that they were entitled to charge rates based on the minimum weight capacity of the cars of gravel which they insist were provided by the general tariff governing interstate shipments at the time.

The appellees, on the other hand, contend that they (appellees) were not permitted in the shipments in question to load the cars to their minimum weight capacity as contemplated by the tariff rates in effect at the time and, therefore, that they should be required to pay only on the actual weight of the gravel shipped. They also contend that the shipments in question were governed by a special tariff. There is no dispute as to the number of cars shipped or as to the amount of freight paid.

It has long been the established rule that freight rates on interstate shipments, such as we have here, are controlled by the tariff promulgated by the Interstate Commerce Commission, and in effect at the time the shipments were made.

Neither the carrier nor the shipper can deviate from these rates. Should the carrier's agent intentionally or unintentionally grant the shipper a lower freight rate than the tariff requires; the carrier may collect this undercharge or rebate from the shipper. Also, in the event of an overcharge, the shipper may recover such overcharge from the carrier.

In *St. Louis, I. M. & S. Ry. Co.* v. *Wolf*, 100 Ark. 22, 139 S. W. 536, Ann. Cas. 1913C, 1384, this court held (quoting headnote): "Where a railway agent by mistake inserted in a bill of lading for an interstate shipment a rate less than the published rate, the railroad company is not bound thereby; and it is immaterial in such case that the shipper and the agent were both ignorant of the published rate."

And in the opinion this court quoted from Barnes on Interstate Transportation, § 446, as follows: "Under the present law, regardless of the rate quoted, the published tariff rate must be paid by the shipper and actually collected by the carrier. . . ." The reason for the rule, Barnes says, is that otherwise "collusion between the carrier and a shipper, which it is desired to favor, for protection for other than tariff rates would be rendered too easy of accomplishment."

In 9 Am. Jur. 534, § 160, the author says: "The general rule requiring adherence to published rates operates also to prevent the carrier from collecting more than its published rate for a particular service, notwithstanding that the carrier, in the publication of such rate, was under a misapprehension as to its applicability to such service."

The record reflects that there was in effect at the time the shipments in question were made, a tariff governing freight rates which contained, among others, the following provisions: "Rates in this tariff are subject to a minimum weight of 90% of the marked capacity of the car, except where car is loaded to full visible capacity actual weight will govern, but in no case less than 54,000 pounds. . . . If a car is diverted or reconsigned in transit prior to arrival at original destination a charge of $2.25 per car will be made for such service. . . . Where a car that has a car capacity of 100,000 pounds the total weight on rails should be 169,000 pounds. Where a car with a matched capacity of 140,000 pounds the total weight, wheels and axles should be 210,000 pounds."

The record reflects that some of these shipments originated on the St. Louis Southwestern Railway Company (commonly called the Cotton Belt), but the St.

Louis-San Francisco railroad was the delivering carrier in every instance. In the movement of these cars there is evidence to the effect that it was necessary that they travel not only on the main lines of these two railroads, equipped with heavy steel and capable of carrying the maximum tonnage of freight cars, but it was also necessary that they travel for short distances over branch lines of these roads having a maximum safe carrying capacity, of gross weight of car and freight, of 169,000 pounds because of the weak condition of the track and lighter rails.

It is undisputed that appellants allowed appellees in each one of these shipments a maximum gross weight of car and gravel of 169,000 pounds, and in two instances where cars were loaded beyond this gross weight, sufficient gravel was thrown off by appellants to reduce the gross weight to 169,000 pounds.

The evidence also reflects that the actual weight of the gravel carried in many of these cars was below 90 per cent. of the minimum of 54,000 pounds provided in the tariff, even though each car was loaded to the maximum tonnage (car and gravel) of 169,000 pounds allowed the shipper by appellants, for the reason that the weight of the cars without the gravel was far in excess of 100,-000 pounds and in some instances the car alone weighed approximately 150,000 pounds, thus permitting the shipper to place but 19,000 pounds of gravel in the car to make the maximum gross capacity of 169,000 pounds. Mr. Pollard testified for appellees that he ordered cars of 100,000 pounds capacity for loading and ''they gave us some piano cars in there 65½ feet long, and weighed in a few thousand pounds of the 169,000 pounds.''

The shipper was charged not on the actual weight of the gravel hauled but 90 per cent. of the minimum, 54,000 pounds, regardless of the weight of the gravel hauled.

It is our view that a fair interpretation of the tariff, set out above and in effect at the time, admits of no such construction as placed upon it by appellant. Such a construction would be unreasonable, arbitrary and unjust to the shipper. This tariff, we think, contemplates shipments on the main line tracks of these roads where the cars may be loaded to their maximum carrying

capacity, and when appellant attempts to apply freight rates under this tariff in situations such as we have here, and, for its own benefit and protection, it has not only limited the maximum gross carrying capacity of the cars in question to 169,000 pounds but at the same time has refused, according to the evidence, to furnish the shipper cars with a capacity for 100,000 pounds or such as would have permitted the shipper to load the minimum capacity of the car and at the same time stay within the 169,000 pounds gross weight allowed. Such action on the part of appellant amounted to an unreasonable and excessive freight charge to the shipper not contemplated under the tariff.

The cause was, we think, correctly submitted to the jury on the theory that appellees were liable only for freight rates applicable to the actual weight of the gravel allowed in each car in question. The amount of the freight charges is not in dispute.

On the record before us we find no error, and accordingly the judgment is affirmed.